ADAMS, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| GERALD REDINGTON, et al., | ) | CASE NO.  5:07CV1999 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | <u>FINDINGS OF FACT AND</u> |
| THE GOODYEAR TIRE & RUBBER | ) | <u>CONCLUSIONS OF LAW</u> |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

This action came on for a Class Settlement Fairness Hearing before the Court on

April 11, 2008, July 7, 2008, and July 22-23, 2008.  The Court has considered all of the

testimony of the witnesses and evidence presented at the Settlement Hearing, the objections to

the proposed settlement, the arguments of counsel, as well as the entire record in this matter, and

being otherwise advised in the premises, herein enters its findings of fact and conclusions of law

in support of final approval of the class action settlement of this action.

## FINDINGS OF FACT

A.    <u>The Parties.</u>

1.    Defendant The Goodyear Tire & Rubber Company ("Goodyear") is in the

business of producing tires for passenger automobiles and other vehicles.  Goodyear provides

healthcare benefits to former hourly employees represented by the United Steel, Paper and

Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International

Union, AFL-CIO/CLC ("USW"), as well as their eligible spouses, surviving spouses and

dependents (collectively, "USW Retirees"), under a series of collectively bargained Pension & Insurance Agreements ("P&Is") between plaintiff USW and Goodyear, the Kelly Springfield Tire Company ("Kelly"), and the former Dunlop Tire Corporation or Goodyear Dunlop Tires North America, Ltd. (collectively, "Dunlop"). These healthcare benefits are further described in summary plan descriptions ("SPDs") and Enrollment Workbooks distributed to USW Retirees.

2.      Plaintiff USW or its predecessor unions has been a collective bargaining representative for employees of Goodyear, Kelly, and Dunlop.

3.      Plaintiffs Gerald Redington and Bennett Toller are former hourly USW-represented employees of Goodyear. Each of them receives retiree healthcare benefits provided by Goodyear. During their employment, each had served as an elected official of his local union.

B.      <u>Plaintiffs' Claims and Goodyear's Defenses.</u>

4.      On July 3, 2007, Messrs. Redington and Toller, on behalf of a Class of USW Retirees, joined with the USW to file this action against Goodyear. (Doc. 1) Plaintiffs sought a declaratory judgment and injunctive relief to prevent Goodyear from unilaterally modifying retiree healthcare benefits. On July 25, 2007, plaintiffs filed their amended class action complaint, again seeking a declaratory judgment and injunctive relief regarding their retiree healthcare benefits. (Doc. 12)

5.      In their amended complaint, plaintiffs allege that Goodyear violated Section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and the Employee Retirement Income Security Act ("ERISA") Section 502(a)(1)(B) and (a)(3), 29 U.S.C.

2

§§ 1132(a)(1)(B) and (a)(3), by announcing in 2006 that it would shift a large part of the cost of retiree healthcare benefits from Goodyear to the Class Members.

6.       The amended complaint also sought the certification, pursuant to Fed. R. Civ. P. 23(b)(2), of a Class of USW Retirees who retired from designated bargaining units prior to January 1, 2007.

7.       Goodyear filed its answer and affirmative defenses on July 26, 2007.  (Doc. 13) Goodyear denied that the retiree healthcare benefits it provides are vested and asserted that it has the right unilaterally to modify or terminate USW Retirees' healthcare benefits.  Goodyear also contended that its annual contributions toward retiree healthcare benefit costs are subject to a negotiated cap and that USW Retirees must pay the excess costs in the form of monthly premiums.

C.       Goodyear's Business.

8.       Goodyear has approximately 72,000 employees worldwide, with about 28,000 employees in the United States.  Approximately 12,000 of Goodyear's domestic employees are represented for purposes of collective bargaining by the USW.

9.       Goodyear's North American Tire ("NAT") business segment operates 23 plants in North America.  Goodyear has approximately 1,000 retail outlets nationwide.

10.       Goodyear is a large private purchaser of healthcare in the United States.  More than half of its healthcare expenditures go to its retiree participants.  Goodyear provides healthcare benefits to over 30,000 USW Retirees, which number is about two and a half times the number of active USW employees.

3

11.     Goodyear operates in a competitive global marketplace and in recent years has faced significant competitive challenges.  Entering 2006 contract negotiations, Goodyear understood that its retiree legacy costs were significantly greater than its competitor tire manufacturers, and that this fact had an impact on Goodyear's financial condition and future profitability.  Changing the model for retiree healthcare was a key element in Goodyear's NAT turnaround plan.

D.     <u>Retiree Healthcare Benefits.</u>

12.     Goodyear contends that it has the right to modify or terminate benefits provided to USW Retirees and that the benefits are not "vested," as plaintiffs claim.  Plaintiffs strongly disagree with Goodyear's position.  Plaintiffs and Goodyear recognize, however, that neither side is assured of success on the vesting issue if this litigation continued to trial.

13.     The USW has made the preservation of retiree healthcare for its members and former members one of its highest priorities.  The USW has been aggressive in conducting or sponsoring litigation challenging employer efforts to reduce or terminate retiree healthcare benefits.  The USW has litigated more than 50 cases on behalf of retirees.

14.     Beginning in 1991, with each newly negotiated P&I Agreement, Goodyear sent letters to the USW, which the USW countersigned, in which Goodyear stated that it would provide healthcare benefits to retirees as provided in the P&I subject to a limit or "cap" on its expenditures.  The caps were also set forth in SPDs distributed to USW Retirees.  Based on SPD language (since 1992) and language in side letter agreements (since 1994), Goodyear considered the caps to apply not only to new retirees, but also to those who retired prior to 1991.  Also,

4

beginning in at least 1980, SPDs provided to most USW Retirees included language reserving Goodyear's right to modify or terminate retiree healthcare benefits.

15.     Until 2003, Goodyear's healthcare costs did not exceed the caps.  In 2003, the caps would have been exceeded had Goodyear not implemented significant plan design changes pursuant to an agreement with the USW.  In late 2006, however, Goodyear announced that, effective April 1, 2007, implementation of the caps would cause significant increases in the premiums charged to USW Retirees.  In discussions with the USW, Goodyear also made clear that it anticipated that its retiree healthcare costs (and in turn, the premiums charged to retirees) would continue to increase substantially in subsequent years.  Under the terms of the P&Is, if USW Retirees failed to pay the required premiums, their healthcare coverage could be terminated.

16.     Benefits in place for USW Retirees as of the time of their retirement were more limited than both benefits currently provided and benefits to be provided under the settlement. For example, under the 1976 and 1979 P&Is, USW Retirees were subject to a lifetime major medical coverage limit of $40,000; the limit was $60,000 under the 1982 and 1985 P&Is, and $80,000 under the 1988 P&I.  Additionally, the pre-1991 P&Is set annual dollar limits for certain covered expenses (*e.g.*, x-ray, radium and radioactive isotopic therapy, doctor visits made during a hospital stay), and specifically listed which diagnostic services would be covered, adding certain services over subsequent labor contracts.

E.     The Settlement Negotiations.

17.     During the 2006 national labor negotiations, Goodyear and the USW engaged in intensive discussions concerning healthcare costs.  Healthcare funding was a significant part of

5

negotiations for a new national master labor agreement, and the dispute regarding retiree healthcare benefits was a contributing factor to the USW's extended strike in late 2006.

18.     Goodyear shared detailed financial information with the USW and its actuary consultants.  Goodyear also provided the USW with copies of the P&Is, SPDs, Enrollment Workbooks and other related documents.

19.     Goodyear proposed creating a Voluntary Employees' Beneficiary Association ("VEBA") that would fund and administer healthcare for current USW Retirees and for USW-represented employees who retire in the future.

20.     The USW concluded that an agreement pursuant to which Goodyear's retiree healthcare obligations would be replaced by a VEBA could, if funded appropriately and if a number of important issues were satisfactorily resolved, be advantageous to USW Retirees. With a VEBA, USW Retirees would no longer be dependent on whether Goodyear was financially capable of providing the benefits, and the determination of premium levels and plan design could be placed in the control of fiduciaries whose sole duty would be to protect the interests of plan participants and beneficiaries.  The USW, however, rejected Goodyear's offer to fund the VEBA with $560 million, and went on strike in early October 2006, with the VEBA funding issue constituting one of the principal issues to be resolved.  The strike lasted nearly three months.

21.     Goodyear ultimately offered $1 billion to fund the VEBA, and also agreed to remit to the VEBA amounts equal to certain profit sharing payments and cost of living adjustments deferred by active employees that otherwise would be paid during the term of the 2006 national labor agreement.  This level of funding would be approximately equal to the value

of a hypothetical court judgment requiring Goodyear to provide retiree healthcare benefits to

USW Retirees and current active employees at the levels that corresponded to the current caps,

discounted to take account of the financial risk that Goodyear might be unable to make those

payments in the future.  The USW concluded that the total funding was a fair resolution.

22.     On December 22, 2006, the USW and Goodyear entered into a Memorandum of

Understanding ("MOU"), made part of the national collective bargaining agreement, which

established the framework for the VEBA (with the $1 billion Goodyear contribution, subject to

certain offsets[1]) and provisionally resolved their dispute.  Active employees ratified the MOU on

December 28, 2006.

23.     Class Counsel have also conducted an independent factual and legal analysis of

the claims in this case.  Class Counsel were provided the information that had been given to the

USW bearing on the history of benefits and the projected cost of the benefit package provided by

Goodyear to retirees, including the P&Is, SPDs and other documents describing Goodyear's

retiree healthcare agreements over the years.  Class Counsel were provided with analyses and

opinions of USW's experts.  Class Counsel and the Class Representative plaintiffs retained their

own experts, including Ian H. Altman ("Altman"), who independently evaluated the

documentation provided by Goodyear (including extensive information from Watson Wyatt

("Wyatt"), Goodyear's actuarial consultant), the USW and the USW's actuarial and financial

---

[1]The $1 billion contribution will be offset by (1) a portion of retiree healthcare costs paid during the current bargaining agreement prior to the establishment of the VEBA (currently estimated at approximately $25 million), and (2) payment to a VEBA to pre-fund a portion of retiree healthcare costs for employees of Goodyear's former Engineering Products Division ("EPD"), which was sold in July 2007. Because Goodyear's Accrued Post-Employment Benefit Obligation ("APBO") liability for active employees of EPD will be transferred to the buyer, the offset will have a neutral or positive effect on the overall VEBA funding.

advisors, including Thomas D. Levy ("Levy") of The Segal Company ("Segal"), and independently evaluated the proposed VEBA.

24.     After extensive analysis over several months, Class Counsel and the Class Representatives accepted the terms of Goodyear's financial obligations under the settlement as negotiated by the USW during collective bargaining.  Together with the USW, Class Counsel developed a series of substantive and procedural protections for the Class that became part of the Settlement Agreement, described below.

F.     The Settlement Agreement.

25.     The Settlement Agreement provides for the establishment and funding of a VEBA trust fund to provide healthcare benefits to the USW Retirees and to future USW-represented retirees, surviving spouses and dependents.  Upon establishment of the VEBA, Goodyear will have no further obligation to provide healthcare benefits to current or future USW Retirees.

26.     Goodyear will contribute $1 billion to the VEBA, subject to specified offsets.  In addition, during the three-year term of the 2006 national labor agreement, contributions of active employees will be remitted to the VEBA based on a portion of the amounts those employees otherwise would receive in cost of living adjustments ("COLA") and profit sharing payments. USW estimates that those additional contributions will add up to approximately $113 million ($108 million if expressed in present value) during the term of the 2006 national labor agreement.  After the expiration of the current labor agreement, pursuant to terms of future collective bargaining agreements, active employees may make additional contributions to the VEBA from COLA increases, profit sharing, wages or signing bonuses in such proportions as

8

the USW may designate.  The money in the VEBA will be available for the exclusive benefit of the current and future VEBA beneficiaries.

27.     The VEBA will be managed and operated by a committee consisting of four Public Members who are healthcare, employee benefits or ERISA experts, by three members appointed by the USW, and by two Class Committee Members (collectively, "the Committee"). No Committee member may be a current or former officer, director or salaried employee of Goodyear.  No Public Member or Class Committee Member can have a financial or institutional relationship with Goodyear or the USW if such relationship could have an impact on his or her independent judgment.  The Class Representatives selected (and will continue to select until January 1, 2023) two Committee members, one of whom will serve as the Secretary.  The Class (as well as the USW) approved the selection of the four Public Members.  *See* Trust Agreement (Doc. 28-10) at § 9.01.

28.     Until the end of the 2009 calendar year (or 2012 in the case of those USW Retirees who retired prior to May 1991 ("Pre-91 Retirees")), the benefits plan adopted by the Committee will provide benefits essentially identical to those that were in effect under the 2003 P&I Agreement, and the monthly premiums for most Class Members will be $130 per household for non-Medicare-eligible retirees and $65 for those who are Medicare eligible.  (For employees who retired after 1996 and whose age and length of service as of the date of retirement added up to less than 95, there will be an additional premium charge.)  Moreover, additional protections for the Class were negotiated by Class Counsel and the USW:  (1) securing set benefits and premiums through 2012 for Pre-91 Retirees; (2) preserving the $50 special Medicare benefit for the life of the VEBA for all Medicare-eligible Class Members; (3) securing a provision that the

9

benefits provided by the VEBA, in combination with Medicare benefits, will be no less valuable for Class Members as a group than for other participants of the VEBA as a group; (4) securing an agreement that, absent specified circumstances, the VEBA's total projected costs for benefits provided may not be reduced by more than 2.5% per year; and (5) providing that the procedural and substantive protections for the Class will be preserved in the event of any mergers, terminations or transfer of assets or liabilities into or out of the VEBA.

        G.      <u>Motion For Class Certification And Preliminary Approval Of The Settlement.</u>

        29.      On October 1, 2007, the Class Representative plaintiffs filed a motion for certification of a Class of approximately 30,000 USW Retirees.  (Docs. 20 and 21)  Class Representatives also sought appointment of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as lead Class Counsel, and Gary, Naegele & Theado, L.L.C. as local Class Counsel.

        30.      On October 29, 2007, the parties jointly moved for preliminary approval of the proposed settlement and of the proposed form of notice to be sent to Class Members.  (Doc. 28)

        31.      On November 8, 2007, in compliance with the Class Action Fairness Act, 28 U.S.C. § 1711 *et seq.*, Goodyear caused notice of the settlement to be provided to the United States Attorney General and the attorneys general in those states where Class Members reside.

        32.      On December 3, 2007, the Court approved Messrs. Redington and Toller as representatives of a Class defined as:

        a.      Retirees who were represented by the USW in collective bargaining and who, as of January 1, 2007, had retired from a Goodyear bargaining unit listed in Attachment 1 to the Amended Complaint, having satisfied the requirements to receive healthcare benefits in the applicable Pension & Insurance Agreements, as well as their spouses and eligible dependents; and

     b.     Surviving spouses of retirees and of former long-term employees of Goodyear (in the bargaining units listed in Attachment 1 to the Amended Complaint) who died during the period of their employment prior to January 1, 2007, and who satisfied the requirements to receive healthcare benefits in the applicable Pension & Insurance Agreements.

(Doc. 32)  The Court also appointed Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as Class Counsel, and Gary, Naegele & Theado, LLC as local Class Counsel.  *Id.*

33.     On December 14, 2007, the Court granted preliminary approval of the Settlement Agreement and approved the form of notice to be provided to Class Members.  (Doc. 33)

H.     The Parties' Conclusions Regarding Settlement.

34.     Based on their extensive factual and legal investigation, Class Counsel have determined that it is in the best interest of the Class that this case be settled as set forth in the Settlement Agreement and that the terms of this Settlement are fair and reasonable.

35.     The USW and Goodyear have also concluded that the settlement is fair and reasonable and in the best interests of the Class.

I.     Subsequent Litigation Events.

36.     Goodyear caused notice of the settlement to be provided to Class Members in accordance with the Court's Order (Doc. 33):

     a.     On January 4, 2008, postcards were mailed to all individual Class Members;

     b.     On January 11, 2008, individual notice packets were mailed to all Class Members; and

     c.     On January 14, 2008, notice was published in the Akron Beacon Journal and USA Today.

37.     Class Members were also directed to a toll-free phone number, toll-free fax number and website for further information.

38.     On January 25, 2008, Class Counsel filed their motion for attorney's fees and reimbursement of costs and expenses.  (Doc. 35)

J.      Objections.

39.     The Court ordered that any objections to the proposed settlement be made on or before March 4, 2008.  (Doc. 33)  As of that time, 29 letters from a total of 32 objectors were received, from less than one-tenth of 1% of the Class.  *See* Exhibit B to Declaration of Dominique Fite (Doc. 60-8) and Attachments thereto (Doc. 60-9).

K.      Fairness Hearing.

40.     On April 11, 2008, the Court conducted a fairness hearing where it heard evidence and arguments of counsel, and heard from the daughter of one objector appearing at the hearing.  *See* Transcript (Doc 84).

41.     Following the April 11, 2008 hearing, the Court directed plaintiffs to provide additional actuarial reports and information for the Court's consideration, which were provided on April 30, 2008, and May 5, 2008.  Thereafter, the Supplemental Declaration of Darren Wells ("Wells") (Doc. 92) was filed in the case at bar thru the Case Management/Electronic Case Files (CM/ECF) system.  Wells is employed by Goodyear as Senior Vice President, Finance and Strategy.  Altman's Expert Report was also submitted by Class Counsel.  *See* Doc. 93.  Finally, the Declaration of Leon A. Potok and two studies authored by his firm, Potok and Co., Inc. (Doc. 94), and the Levy Declaration and the actuarial study authored by Segal (Doc. 95) were submitted by the USW.

42.     Altman estimated that the VEBA would last for 30 years (based on annual 2.5% cuts), if the active USW employees of Goodyear remains stable and increases the level of

diversion from COLA from $1 per hour to $1.33 per hour starting in 2010, and the diversion from profit sharing from $1 by a like amount, with subsequent inflation increases every three years.  Altman also estimated that in order for the VEBA to last for 30 years without the 2.5% cuts, it would take increasing the diversion from COLA from $1 per hour to approximately $2.15 per hour starting in 2010, and the diversion from profit sharing from $1 by a like amount, with subsequent inflation increases every three years.  *See* Corrected and Supplemental Altman Declaration (Doc. 83) at ¶ 7.

43.    The Bankruptcy and Credit Default Risk Study Update (Doc. 94-2), authored by Potok and Co., Inc., compared three analytical approaches used to determine the probability of a Goodyear bankruptcy or credit default over ten and fifteen year time horizons.  The results of the analysis found the likelihood of a default on Goodyear's bonds over the next ten to fifteen years ranging between 21% and 61%, as compared to between 24% and 42% in June 2007 and between 29% to 57% in December 2006.  Based on rating agency data, Goodyear's default risk has declined, which is largely due to an improved credit rating.  Altman Z-Score is a measure used to predict the likelihood that a business will fall into bankruptcy.  Though Goodyear's Z-scores have edged up slightly in the last six months, its current score of 2.11 suggests that its credit worthiness still requires significant caution.

44.    In addition to the Default Risk Study, the USW asked Potok and Co., Inc. to undertake the analysis reflected in the Diversion Study (Doc. 94-3).  The Diversion Study was prepared in conjunction with an actuarial study prepared by Segal.  Segal asked Potok and Co., Inc. to determine a range of possible scenarios, involving different combinations of profit sharing and COLA payments, that would achieve specified levels of future contributions by the

active workforce to the VEBA ("diversions"), representing the contributions that Segal determined would be needed to sustain the VEBA for specified periods of time if benefits were provided under three different sets of circumstances:  one that would correspond to a situation in which the VEBA Committee never made any changes in benefits or premium sharing, and two in which the Committee reduced costs by 2.5% each year.

45.     The scenarios presented in the Diversion Study indicate that if no cuts are made in the level of benefits provided by the VEBA, and making what Potok would regard as plausible assumptions as to the amounts that will be diverted to the VEBA from profit sharing, the COLA diversions that would be necessary to sustain the VEBA for at least 20 years would represent less than the portion of COLA that the employees would receive in their paychecks over that period, and would amount to a relatively small percentage of the employees' total wages.  Doc. 94-3 at 2-6.  If there were to be reductions in benefits, or if the VEBA were to be sustained for less than 20 years, even less in the way of diversions would be needed.  *Id.* at 7-16.

46.     The Segal Actuarial Study (Doc. 95-2) shows the assets remaining in trust under various scenarios at three, five, 10, 15 and 20-year intervals.  The scenarios are structured to show the effects of two variables:  (i) different levels of contributions to the trust by active employees over time, and (ii) different levels of benefits provided to the class over time.  In addition to showing the impact of these two variables on the trust assets, the scenarios also show the value of the annual benefits that would be provided to a class member, including his or her spouse and dependents, in each case, as compared to the value of the benefits that would be provided by Goodyear if the caps were imposed.

14

47.    The fairness hearing resumed on July 7, 2008, at which time the Court heard from Altman, Class Counsel's actuary.  *See* Transcript (Doc 101).  The balance of the settlement hearing was completed on July 22-23, 2008.  Levy and Ron A. Bloom ("Bloom") testified on July 22, 2008.  *See* Transcript (Doc 104).  After Bloom's testimony concluded on July 23, 2008, the Court heard from Ron Hoover ("Hoover") and Harry D. Alford ("Alford").  *See* Transcript (Doc 105).

48.    Altman testified that the longevity of the VEBA in precise terms is difficult to predict because it will be sensitive to a great number of assumptions and economic and demographic occurrences.  He stated the future of the VEBA will not be determined by a single event -- there will be a series of events and reactions.  So, the VEBA Committee and the USW will have ample opportunity and Altman fully expects they will be adjusting the contributions and payments in reaction to favorable or unfavorable experience of the VEBA.  Amongst the most important factors that Altman found in doing his analysis are support from the active employees in the form of future contributions and the rate of medical inflation.  Doc. 101 at 7-8.  Altman concluded, however, that even if there's no ongoing support from the active employees, this VEBA will be able to provide benefits to the Class Members at above the capped level for at least ten years until they become Medicare eligible.  *Id.* at 8; 30-31.

49.    Levy testified that the Class Members are highly likely to receive healthcare benefits through the VEBA that are more valuable than a continuation of the Goodyear capped healthcare benefits.  *See* Doc. 104 at 8-9.  Levy also testified regarding the February 26, 2008 Associated Press article that the Court initially brought up during the July 7, 2008, hearing.  Levy stated that the rate used by the office of the actuary of the Center for Medicare and

15

Medicaid Studies ("CMS") was lower than the rate he assumed in his trend assumption for the VEBA in the first year, and then continued to be lower in most years.  *Id.* at 14.  According to Levy, the VEBA would survive for a longer period of time using the CMS trend rates than the ones Segal actually used, primarily because in the early years, when the group is largest, Segal has substantially higher trend rates than the ones that are in the federal projections.  *Id.* at 16.

50.     Bloom testified about the USW's decision-making regarding the settlement and Memorandum of Understanding supplied in this action, *i.e.*, how the USW and the negotiating team that he was working with and the membership addressed the retiree healthcare challenges. He explained how historically the active employees of Goodyear have supported retiree benefits. Bloom also testified the active employees were made explicitly aware in the Summary of 2003 Proposed Agreement (USW Plaintiff's Exhibit 1) that their potential compensation was being reduced to cover the cost of the retiree healthcare.  *See* Doc. 104 at 66-70.  Similarly, the active employees understood in 2006 that future diversions of COLA and profit sharing to the VEBA might be expected in future collective bargaining agreements. *See, e.g.*, Summary of 2006 Proposed Agreement (USW Plaintiff's Exhibit 2) at 7; *see also* Doc. 105 at 24-30.

51.     Hoover and Alford testified about the communications with the active employees. Hoover described the negotiating committee's role and processes.  Alford, President of USW Local 878L, testified regarding the membership's communication and ratification process.  The Weekly Information Handout, dated November 21, 2006 (Exhibit 3), is one of the documents that Alford handed out to the members of his local during the strike.

16

L.    Overall Findings of Fact.

52.    There is no evidence to support a conclusion that there was any collusion among the parties.  To the contrary, the record evidence, including the evidence of contentious positions relating to the negotiation of the settlement, establishes that the parties' conduct in this litigation was at all times above board and non-collusive.

53.    Class Counsel diligently investigated the proposed settlement, acted solely in the interest of the Class, and concluded, based upon the expert opinions available to them and their considerable experience in like cases, that the settlement is fair, reasonable, and adequate for the Class.

54.    The USW negotiated the settlement in good faith and for the purpose of furthering the strong mutual interest of active and retired employees in retiree healthcare benefits.

55.    This case does not involve a limited fund, an artificially created limited fund or an externally limited pool of assets for satisfaction or competing claims.

56.    The USW Retirees' potential loss of all benefits, due to Goodyear's future financial condition or its prevailing on the merits, or the loss of benefits as a result of a finding that USW Retirees were vested only in those benefits in place at the time of their retirement, would be far worse for Class Members than settling under the terms of the Settlement Agreement.

17

## CONCLUSIONS OF LAW

A.    <u>Jurisdiction and Venue.</u>

1.    This Court has jurisdiction under Section 301 of the LMRA, 29 U.S.C. § 185, and Section 502(e)(1) and (f) of ERISA, 29 U.S.C. §§ 1132(e)(1) and (f).

B.    <u>Class Certification.</u>

2.    The Court reiterates its findings and conclusions set forth in its December 3, 2007 Order (Doc. 32), that the requirements of Fed. R. Civ. P. 23(a) and (b)(2) are satisfied in this case.

C.    <u>Final Approval Of The Class Action Settlement.</u>

3.    This Court must evaluate the proposed settlement in light of the general federal policy favoring the settlement of class actions.  *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers*, 803 F.2d 878, 880 (6th Cir. 1986) (per curiam).  The Court's role is to determine whether the settlement as a whole is fair and reasonable and not the product of fraud or overreaching.  *Id.*; *see also Berry v. School Dist. of City of Benton Harbor*, 184 F.R.D. 93, 97 (W.D. Mich. 1998) ("The court's role . . . is properly limited to the minimum necessary to protect the interests of the class and the public.") (internal citation and quotation omitted).

4.    Given this well-settled policy, "a district court's role in evaluating a private consensual agreement 'must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'"  *Clark Equip. Co.*, 803 F.2d at 880 (citation omitted).

18

5.      Rule 23(e)(2) requires the Court to determine whether the settlement is a "fair,
reasonable, and adequate" resolution of class members' claims.  "In a fairness hearing, the judge
does not resolve the parties' factual disputes, but merely ensures that the disputes are real and
that the settlement fairly and reasonably resolves the parties' differences."  *UAW v. General
Motors Corp.*, 497 F.3d 615, 636-37 (6th Cir. 2007).  The Court is entitled to consider briefs,
declarations, affidavits and the arguments of counsel.  *Tenn. Ass'n of Health Maint. Orgs., Inc. v.
Grier*, 262 F.3d 559, 567 (6th Cir. 2001) (stating that "we reject intervenors' suggestion . . . that
the fairness hearing must entail the entire panoply of protections afforded by a full-blown trial on
the merits"); *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994) (stating
that "there is no requirement that an evidentiary hearing be conducted as a precondition to
approving a settlement in a class action suit").  "Even when the Court becomes aware of one or
more objecting parties, the Court is not required to open to question and debate every provision
of the proposed compromise.  The growing rule is that the trial courts may limit its proceeding to
whatever is necessary to aid it in reaching an informed, just and reasoned decision."  *Ass'n for
Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) (internal
quotation and citation omitted).

6.      Generally, the Sixth Circuit does not require that a settlement that has been
substantially negotiated prior to the institution of litigation must be subject to more rigorous
scrutiny than one which is entirely the product of litigation.  *UAW v. General Motors*, 497 F.3d
at 631-33.  Nevertheless, the Court in this instance is mindful of the fact that the USW and
Goodyear arrived at the amount of Goodyear's payment to the VEBA in the context of collective
bargaining, which, however hard-fought, could encompass issues beyond the interest of the

19

Class in settling this action.  The Court is also mindful of the overwhelming importance of the benefits to be provided by the VEBA to the Class, making the viability of the VEBA especially important.  Accordingly, the Court has taken pains to assure itself that the Class Representatives and Class Counsel have exercised reasonable and independent judgment in agreeing to the Settlement.   The Court finds that the extensive provisions in the VEBA trust agreement, which provide protections for the Class relative to the interests of subsequent retirees and assure that the Committee that governs the VEBA will appropriately consider the interests of Class Members, represent strong evidence that Class Counsel exercised judgment on behalf of the Class independent of the USW.   While the Court understands that the VEBA's long term viability relies on continued support from the active Goodyear workforce that will look to the VEBA for its own benefits, the Court is satisfied that Class Representatives and Class Counsel made a reasoned and considered judgment in agreeing to participate in an open VEBA (*i.e.*, one that permits new entrants) as the best way to provide benefits to the Class in excess of the capped level of benefits they might have received through even successful litigation.

> D.      The Class Action Settlement Factors.

7.      The Sixth Circuit has fashioned a series of factors to consider in weighing the potential risks and rewards inherent in going forward with litigation against the certainty of a compromise solution.  Those factors are:

> a.      the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement;
>
> b.      the risks, expense, and delay of further litigation;
>
> c.      the judgment of experienced counsel who have competently evaluated the strength of their proofs;

20

> d.  the amount of discovery completed and the character of the evidence uncovered;
>
> e.  whether the settlement is fair to the unnamed class members;
>
> f.  objections raised by class members;
>
> g.  whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and
>
> h.  whether the settlement is consistent with the public interest.

*UAW v. General Motors*, 497 F.3d at 631.  The Court may choose to consider only those factors that are relevant to the settlement at hand and may weigh particular factors according to the demands of the case.  *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205-06 (6th Cir. 1992).

      8.  <u>The likelihood of success on the merits weighed against the amount and form of relief offered in the settlement.</u>  In evaluating the likelihood of success on the merits as compared with the relief offered in the settlement, the Court "is not to decide whether one side is right or even whether one side has the better of these arguments."  *UAW v. General Motors*, 497 F.3d at 632; *accord Carson v. Am. Brands*, 450 U.S. 79, 88 n. 14 (1981).  The ultimate question, rather, is "'whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.'"  *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 522 (E.D. Mich. 2003) (quoting MANUAL FOR COMPLEX LITIG. § 30.42 (3d ed. 1995)); *see also Shy v. Navistar Int'l Corp.*, No. C-3-92-333, 1993 U.S. Dist. LEXIS 21291, *11 (S.D. Ohio May 27, 1993) ("It is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member;

rather, the settlement, *taken as a whole*, must be fair, adequate and reasonable.") (citation omitted) (emphasis in original).

9.      Litigation concerning retiree healthcare is fact-intensive and uncertain.  As the Sixth Circuit stated in approving the General Motors and Ford VEBA settlements, the parties in those cases were able to point to "two lines of Sixth Circuit cases" that they cited as "offer[ing] competing answers" to the question whether the benefits at issue in that case were vested.  *UAW v. General Motors*, 497 F.3d at 631.  Class Counsel would argue that the language in the collective bargaining agreements and plan documents in this case is similar to language in collective bargaining agreements and plan documents that this Court construed as providing evidence of vesting retiree healthcare benefits in *UAW v. Loral Corp.*, 873 F. Supp. 57 (N.D. Ohio 1994), *aff'd*, Nos. 95-3710, 95-3711, 1997 U.S. App. LEXIS 2118 (6th Cir. Feb. 3, 1997) (unpublished), and that was present in *Noe v. PolyOne Corp.*, 520 F.3d 548 (6th Cir. 2008). However, Goodyear asserts, among other things, that both language in the SPDs reserving the company's right to modify or terminate benefits and the cap letters establish that benefits are not vested.  Goodyear further asserts that, historically, the benefits of persons already retired have been changed at various points after their retirement, with some of the changes constituting reductions of certain benefits; and Goodyear argues that this shows that the benefits have been understood not to be vested.  In neither *Loral* nor *Noe* did the Court address cap letters, statements in plan documents or SPDs, or historical benefit reductions for retirees.  In short, neither side could be assured of success.

10.      Equally important is the fact that all litigation involves risks.  However strong the plaintiffs' or Goodyear's position may or may not be at the end of the day, all parties recognize

22

the inherent uncertainties of litigation and the potentially catastrophic consequences for retirees should a court hold that their healthcare benefits are not vested.  Such a holding would mean that Goodyear was legally free not merely to modify those benefits but to eliminate them entirely. The plaintiffs and USW reasonably concluded that such a risk of such grave consequences, no matter how remote in their view, was well worth avoiding through a settlement that guarantees continued healthcare benefits for the Class.  *See UAW v. General Motors Corp.*, No. 05-CV-73991-DT, 2006 U.S. Dist. LEXIS 14890, at *49 (E.D. Mich. Mar. 31, 2006) (recognizing that litigation regarding retiree healthcare carries "potentially catastrophic consequences for retirees" as an adverse ruling could mean termination of the benefits).

11.     In addition, even if the plaintiffs were to prevail on the merits, what they would ultimately be entitled to receive would be far from apparent: "Is it *all* retiree health benefits or just certain stated benefits?"  *Noe*, 520 F.3d at 567 (Sutton, J., concurring and dissenting) (emphasis in original).  *See Prater v. Ohio Educ. Ass'n.*, 505 F.3d 437, 441 (6th Cir. 2007) (Judge Sutton posing similar questions).  *See also Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 581 (6th Cir. 2006) (recognizing that in the case of vested benefits "someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself").  As a result, even if benefits were found to be vested at retirement, the USW Retirees' entitlement to benefits could be limited as compared with the present benefits and premiums.  Therefore, to the extent that Class Counsel would argue that Pre-91 Retirees have alternative arguments for vesting, they could also be more vulnerable.  The settlement provides special protections for this group assuring no benefit cuts through 2012, and preserving the Special Medicare Benefit from cuts.  More importantly, the Court is mindful that Goodyear

might successfully limit the benefits of this group to the benefit packages available at the time they retired.  These packages contained more stringent dollar limitations and now obsolete substantive limits on coverage that would put this population immediately at risk.

12.     There are other substantial advantages to the Class in the proposed settlement. For the first time, healthcare benefits for the Class will be pre-funded and will no longer depend on Goodyear's financial performance.  *See UAW v. General Motors*, 497 F.3d at 632 (stating that "[i]f we decided for the sake of argument that the retirees were likely to win the debate, any such victory would run the risk of being a Pyrrhic one because the cost of insisting on irreversible healthcare benefits might well be -- and indeed almost certainly would be -- the continuing downward spiral of the companies' financial position").  The settlement secures retiree healthcare with a $1 billion contribution by Goodyear.  The settlement also provides that, between now and the end of 2009, additional contributions estimated at $113 million ($108 million in present value) will be made to the VEBA from profit sharing and COLA payments that otherwise would be received by active employees.  Thus, the total VEBA funding is projected to amount to approximately $1.1 billion in present value.  To put that figure in context, Goodyear's Accrued Post-Employment Benefit Obligation ("APBO") related to healthcare costs for USW Retirees, as estimated by Goodyear's actuaries, was $1.2 billion as of January 1, 2007. Therefore, the value of the VEBA funding is approximately equal to the value of a judgment requiring Goodyear to provide lifetime benefits at the current benefit levels and subject to the current caps to Class Members (and to current active employees when they retire).

13.     The settlement also maintains, through 2009 (or until 2012 for Pre-91 Retirees), the same comprehensive levels of coverage that USW Retirees now receive.  Once the period of

24

fixed benefits and premiums has elapsed, the VEBA Committee is given flexibility in determining future retiree healthcare coverage, and the Settlement Agreement imposes limits on this flexibility to protect the Class.  The Committee cannot reduce the per capita cash cost of the benefits provided by the VEBA by more than 2.5% per year except under limited circumstances. Consequently, if the VEBA does not receive sufficient future contributions by active employees to assure its continued viability, the amount contributed by Goodyear pursuant to the Settlement Agreement will be spent primarily on benefits for Class Members.  The contribution made by Goodyear in the settlement, and the careful design of the VEBA -- which balances protections for the Class with flexibility to preserve the VEBA's soundness -- provides a meaningful incentive for the active employees to continue their support for the VEBA.  Moreover, the USW, as the bargaining agent for the active employees, is strongly committed to continuing that support.

14.     Collectively, the nine proposed VEBA Committee members bring a wealth of expertise to the VEBA, including in the areas of employee benefits law, plan administration, investment advice, counseling of fiduciaries, public policy analysis, government regulation and, in the case of the three members appointed by the USW, direct involvement in the negotiation and administration of the retiree healthcare programs at Goodyear and other companies.  Each of the members of the VEBA Committee is required to bring his expertise to bear in discharging the members' fiduciary duty to act "solely in the interest of the [VEBA] participants and beneficiaries" as a group.  29 U.S.C. § 1104(a)(1).  All Committee members, regardless by whom they were selected initially, have the duty not to "administer [the] trust fund in the interest of the party that appointed [the]m," *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 330 (1981), but

25

instead to act solely in the interests of the VEBA beneficiaries, "tak[ing] impartial account of the interests of all beneficiaries." *Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996).  *See also Bailey v. AK Steel Corp.*, No. 1:06-cv-468, 2008 WL 495539, at *8 (S.D. Ohio Feb. 21, 2008) (stating that "there is no requirement in law that trustees be chosen or elected by plan participants"). Furthermore, the Settlement Agreement (Doc. 28-4) provides in § 9(a) that the Court will retain exclusive jurisdiction to resolve any disputes over the "enforcement, implementation, application or interpretation of . . . this Settlement Agreement."

15.     The risk, expense and delay of further litigation.  The settlement also provides immediate certainty for Class Members.  Complex litigation of the sort involved in this case is costly and time-consuming.  In *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (en banc), the litigation went on for nine years, in *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), for seven years, and in *Bittinger v. Tecumseh Prods.*, 201 F.3d 440 (6th Cir. 1999), for eight.  *See* discussion in *UAW v. General Motors*, 2006 U.S. Dist. LEXIS 14890, at *54; *UAW v. Ford Motor Co.*, Nos. 05-74730, 06-10331, 2006 U.S. Dist. LEXIS 70471, at *70-*71 (E.D. Mich. July 13, 2006); and *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 596 (E.D. Mich. 2006).  Delay will not benefit the Class Members, an elderly group of individuals.

16.     The judgment of experienced counsel who have competently evaluated the strength of their proofs.  All counsel support this settlement.  The informed and reasoned judgment of plaintiffs' counsel, and their weighing of the relative risks and benefits of protracted litigation, is entitled to great deference.  *See UAW v. General Motors*, 2006 U.S. Dist. LEXIS

26

14890, at *57 ("The endorsement of the parties' counsel is entitled to significant weight, and supports the fairness of the class settlement.").

17.    <u>The amount of discovery completed and the character of the evidence uncovered.</u> Although there was no formal discovery, Goodyear disclosed to the Class (and USW) detailed information regarding Goodyear's business and financial condition, including its healthcare liability and the relevant contracts and healthcare plan documents.  This is confirmed by USW and the Class, who selected experts and undertook their own independent analyses of Goodyear's condition and legal position.  There was significant information available to the parties to negotiate their compromise, and there is more than an adequate basis and evidentiary record on which the Court can assess the parties' agreement.  *See UAW v. General Motors*, 2006 U.S. Dist. LEXIS 14890, at *59-*60.  *See also id.*, at *58 (noting that "the absence of formal discovery is not unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties"); *UAW v. Ford*, 2006 U.S. Dist. LEXIS 70471, at *73 (same); *IUE-CWA v. General Motors*, 238 F.R.D. at 598 (same).

18.    <u>Whether the settlement is fair to unnamed Class Members.</u>  The Class is cohesive and the Settlement Agreement affects similarly situated Class Members without providing any preferential benefits to the Class Representatives.  Because Class Members share the same interest in seeking the best possible benefits for USW Retirees, there is no risk of an undue burden on absent Class Members or preference to the Class Representatives.  *See Heit v. Van Ochten*, 126 F. Supp. 2d 487, 490-91 (W.D. Mich. 2001) (rejecting suggestion of collusion in part due to the absence of preferential treatment of named class members); 5 MOORE'S FED.

27

PRAC. at § 23.164[3] (3d ed. 1995).  To the extent that the Settlement Agreement provides special protections for any portion of the Class, it is for the Pre-91 Retirees -- a group that does not include the Class Representatives.  These protections are warranted considering that this group retired prior to the imposition of the cap letters and in recognition of the more elderly population of that part of the Class.  *See UAW v. General Motors*, 497 F.3d at 624 (approving class action settlement giving preferential treatment to certain retirees).

19.    Objections raised by Class Members.  Less than one-tenth of 1% of Class Members objected to the settlement.  "A court should not withhold approval of a settlement merely because some class members object."  *Mich. Hosp. Ass'n v. Babcock*, No. 5:89-CV-00070, 1991 U.S. Dist. LEXIS 2058, at *10 (W.D. Mich. Feb. 11, 1991); *accord Reed v. Rhodes*, 869 F. Supp. 1274, 1281 (N.D. Ohio 1994); 7B FED. PRAC. & PROC. § 1797.1 (3d ed. 2005) (stating that "the fact that there is opposition does not necessitate disapproval of the settlement").  This minimal level of opposition is significant evidence of the Class Members' general acceptance of and support for the Settlement Agreement.  *See Robinson v. Ford Motor Co.*, No. 1:04-CV-00844, 1:04-CV-00845, 2005 U.S. Dist. LEXIS 11673, at *17 (S.D. Ohio June 15, 2005) (stating that "a relatively small number of class members who object is an indication of a settlement's fairness") (citation omitted); *In re Cardizem*, 218 F.R.D. at 527 (stating that "[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement"); *Berry*, 184 F.R.D. at 106 (stating that "the minimal opposition suggests that the class as a whole is in favor of the agreements").  *Cf. UAW v. General Motors*, 497 F.3d at 620 (Sixth Circuit characterizing a level of "less than one half of one percent" as "[a] small percentage of retirees" objecting to the class settlement there).

20.     The most common objection was that Goodyear had promised "lifetime" benefits that cannot be changed.  Disagreement over the merits of the parties' dispute, however, is not a basis for disapproving a settlement.  *Laskey v. UAW*, 638 F.2d 954, 957 (6th Cir. 1981) (stating that "the objections made indicated these employees did not want to compromise at all but wanted full benefits, rather than making any complaint directed to the adequacy of their legal representation").  In approving the GM and Ford VEBA settlements, the Sixth Circuit found that a legitimate legal dispute over "vested" retiree healthcare benefits existed and the parties appropriately used the VEBA settlement to resolve their dispute.  *UAW v. General Motors*, 497 F.3d at 632.

21.     Other objectors expressed their view that Goodyear is morally obligated to provide retiree healthcare benefits because of their years of service to the company, the hours they worked and the sacrifices they made in terms of their health and family life.  While the objectors' efforts and sacrifices on behalf of Goodyear are not disputed by the parties, "[t]he Court is not being asked the moral question of whether [the company] is treating its retirees reasonably.  Rather, the Court is being asked the legal question of whether the proposed settlement [is] a reasonable compromise of a legal dispute."  *Rexam, Inc. v. United Steel Workers of Am.*, No. 03-CV-2998-PJS/JJG, 2007 WL 2746595, at *2 (D. Minn. Sept. 17, 2007).  Even assuming that the Class has a substantial claim that retiree healthcare benefits are vested, there are significant risks that the Class would not prevail if this case were to go to trial.  In light of that risk, the value of the proposed settlement, which is roughly equivalent to the value of Goodyear's capped benefit obligations, is a reasonable compromise of the claim.

22.     Another objection is that USW Retirees will have difficulty affording their benefits or the settlement takes away their benefits.  However, the Settlement Agreement does not take away benefits.  Rather, the benefits are essentially the same as those provided under the 2003 P&I and will be preserved for those who retired after May 1, 1991 until 2010 and until 2013 for Pre-91 Retirees.  During that period the premium levels will be set at $130 per household for non-Medicare eligible retirees and $65 for those who are Medicare eligible. Moreover, the $50 Special Medicare Benefit will be preserved for the life of the VEBA for Medicare eligible Class Members receiving coverage under the VEBA.

23.     Some Class Members objected that the VEBA does not provide a lifetime guarantee, and could run out of money.  "The absence of a guarantee [of benefits] is understandable because the underlying legal debate turns in part on whether a guarantee is required . . . ."  *UAW v. General Motors*, 497 F.3d at 633.  Class Representatives and the USW concluded that the structure and governance provisions of the VEBA Trust appropriately protect the Class from precipitous benefit cuts.  Actuaries for the USW and the Class have projected that the level of investment in the VEBA nearly equates with Goodyear's projected Other Post-Employment Benefits ("OPEB") liability for this Class.  The level of funding is fair, adequate and reasonable.  *See Bailey*, 2008 WL 495539 at *1, *6 (approving class action settlement of claims involving retiree healthcare in which VEBA funding represented approximately 60% of company's OPEB obligation).  Further, actuaries for both the Class Representatives and the USW have provided detailed information regarding the VEBA's future viability.  These actuarial reports demonstrate, among other things, that the VEBA has the

30

potential of lasting indefinitely, depending on the levels of benefits provided and future contributions from active employees.

24.     An objection was made on the ground that Goodyear presently is financially successful.  However, Goodyear operates in a very competitive marketplace, and, in fact, the Company has sustained significant losses in recent years.  Without the VEBA and its guaranteed funding, healthcare benefits for Class Members would depend entirely on Goodyear's future financial performance.  The VEBA eliminates this risk.  Moreover, Goodyear's current financial performance permits it to fund the VEBA with $1 billion.  *Cf. Bailey*, 2008 WL 495539, at *6 (recognizing that the 2007 profitability of AK Steel allowed the company to secure retiree healthcare with a VEBA settlement).

25.     Three objectors allege that they were told by Goodyear and/or the USW that they would retain their medical benefits until they died and that Goodyear should, therefore, be held to that promise.  Whether retiree medical benefits are vested depends on the language of the collective bargaining agreement or the plan.  *Yard-Man*, 716 F.2d at 1479.  Out of the 33,000 members of the Class, only three filed objections alleging that they had been told at meetings or in exit interviews that their benefits were for life.  Even if these objectors were able to produce probative evidence that they were promised lifetime benefits in meetings or at exit interviews, testimony from this small number would not be enough to alter the risk of litigating the claims to conclusion.

26.     Four objectors claim that they were forced to retire due to disability that occurred on the job and that they should, therefore, be entitled to lifetime benefits.  The collective bargaining agreements allowed for disability retirements under certain conditions and provided

that those who retired under the pension plan would be entitled to medical benefits.  Individuals who retired on disability, therefore, retired under the same terms as those who retired based on years of service and are subject to the same risk as other members of the Class.  Their objection does not provide a basis for overcoming the Settlement Agreement.

27.     One objector is concerned that the Class Representatives, who were allegedly chosen by the USW, were given the right to select the VEBA Committee members without any input from the Class or explanation of how they made their choices.  The objector is also concerned that there is no clear process for retirees to be informed of the issues before the Committee or how to express their opinions or concerns on VEBA administration and asset investment and acquisition.  However, the Settlement Agreement includes mechanisms designed to insure that the concerns of the retirees will be brought to the Committee.  Although there are no Class Members on the Committee, two members were added to the Committee who were appointed by and serve at the pleasure of the Class Representative Board (comprised of the Class Representatives).  The initial Class Committee members have considerable professional experience involving healthcare plans.  The Settlement Agreement further provides for a Retiree Communications Committee, which will be an *ad hoc* advisory and communications group established by the USW and the Committee for the purpose of disseminating information to retirees and providing feedback to the Committee.  The Settlement Agreement, therefore, provides substantial protections designed to protect the interests of the Class.

28.     One objector expressed concern that retirees, unlike active employees, do not have a vote in the USW and, therefore, are not fairly represented in retiree medical plans proposed or accepted by the USW.  There is no evidence that the USW sacrificed the interests of

32

the retirees for the interests of the active workforce.  Rather than skewing the settlement in favor

of active USW members, the settlement favors the Class Members because it contains

provisions, described above, that protect Class Member benefits and prohibit the Committee

from making benefit design changes in the future that treat others more favorably than Class

Members.  Limits on the aggregate benefit reductions also favor the Class because they assure

that VEBA funds are spent on Class Members rather than preserved for those who have not yet

retired.  Although the Settlement Agreement reflects the results of USW negotiations with

Goodyear, the Sixth Circuit has consistently held that a union may negotiate for and assert rights

on behalf of retirees.  *See Yard-Man, Inc.*, 716 F.2d at 1486; *Communications Workers v.*

*Michigan Bell Tel. Co.*, 820 F.2d 189, 192 (6th Cir. 1987) (stating that "the union had standing

to assert the retirees' rights under the [CBA] to which it was a party").  The active USW

workforce went on strike for almost three months in order to obtain a sufficient level of funding

for the VEBA from Goodyear and agreed to give up a portion of profit sharing and cost of living

increases to provide additional funding.  Moreover, the USW has made clear that it is strongly

committed to supporting, by continued contributions to the VEBA from current and future

Goodyear employees, the ability of the VEBA to provide retiree healthcare benefits at a level

that will allow the class and future retirees to afford quality healthcare indefinitely.  Thus, the

framework and resulting agreement are likely more advantageous to the retirees than any

agreement negotiated solely on their behalf without the USW's involvement.  *See General*

*Motors*, 2006 U.S. Dist. LEXIS 14890, at *74.

       29.     One objector asserted that Messrs. Redington and Toller should not be on the

Class Representative Board because they were the plaintiffs and have a conflict of interest.  In

33

naming Mr. Redington and Mr. Toller to be Class Representatives, this Court found that they possess the same interest and suffer the same injury as other Class Members.  Fed. R. Civ. P. 23(a)(4).  Messrs. Redington and Toller did not receive any remuneration for serving as Class Representatives and will not receive any remuneration for serving on the Class Representative Board.  Accordingly, there is no conflict of interest that exists because they served as Class Representatives.

30.     One Class Member objects to the settlement on the grounds that he, as a Medicare eligible retiree, will not be getting sufficient value for the amount of money he will be required to pay in premiums in order to obtain coverage from Anthem Blue Cross Blue Shield.  He will, however, be required to pay less in premiums to the VEBA for that coverage than he would be required to pay if the settlement is not approved.  Moreover, the Committee has the power to change the carriers providing benefits to VEBA participants and, therefore, is in a position to correct the situation if the coverage is too expensive.  Accordingly, this objection does not merit disapproval of the Settlement Agreement.

31.     <u>Whether the settlement is the product of arms' length negotiations as opposed to collusive bargaining.</u>  The settlement process was arm's length, with each party representing and pursuing its own interests.  Courts presume the absence of fraud or collusion unless there is evidence to the contrary.  *UAW v. General Motors*, 497 F.3d at 628 (stating that "courts customarily demand evidence of improper incentives for the class representatives or class counsel . . . before abandoning the presumption that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands"); *Granada Invest., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of

34

fraud or collusion, such settlements are not to be trifled with.") (citation omitted).  Here, there

was an adversarial relationship between the Class/USW and Goodyear on the question of

Goodyear's right unilaterally to change, modify or terminate healthcare benefits.  The parties are

in fundamental disagreement on this issue.  The settlement was the result of hard negotiations

over many months (including a three-month strike), the exchange and evaluation of extensive

information, and the independent review and acceptance of the compromise by all parties.

   32. <u>Whether the settlement is in the public interest.</u>  There is a significant public

benefit obtained by approval of the Settlement Agreement.  The settlement serves the public

interest by securing healthcare for USW Retirees with a $1 billion contribution.  *See Bailey*,

2008 WL 495539, at *4 (stating that "the public interest clearly favors the providing of

meaningful health insurance coverage for as much of the population [a]s possible").  This money

is guaranteed for VEBA beneficiaries, regardless of what happens to Goodyear.  The delay and

risks of litigation would have an impact not only on Goodyear, the USW, and the Class, but also

on the families, businesses, and communities that depend on Goodyear's continued viability.

   E. <u>Goodyear's Payments To Class Counsel and USW.</u>

   33. Class Counsel's motion for payment of attorney fees and costs and expenses

seeks reimbursement for reasonable hours worked.  There is no contingency or premium fee

arrangement.  Payment to Class Counsel will not have an impact on Goodyear's contribution to

the VEBA.

   34. The Settlement Agreement also provides for Goodyear to make certain payments

to the USW and its advisors in connection with the resolution of this case.  Section 302 of the

LMRA makes it unlawful, subject to important exceptions, for an employer to give something of

35

value to a union.  29 U.S.C. § 186(a).  A reciprocal provision makes it unlawful for a union to accept such payments.  29 U.S.C. § 186(b).  Section 302(c)(2) is an exception to this prohibition, allowing an employer to make payments to a union in settlement of a disputed claim.  29 U.S.C. § 186(c)(2) (providing for an exception "with respect to the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress").  "[A] straightforward interpretation" of § 186(c)(2) makes that provision applicable to payments arising from a settlement agreement, court judgment or other judicial resolution.  *Humility of Mary Health Partners v. Local 377 Chauffeurs, Teamsters, Warehousemen, & Helpers of Am.*, 296 F. Supp. 2d 840, 846-47 (N.D. Ohio 2003); *accord White v. National Football League*, 836 F. Supp. 1458, 1494 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994) (approving payments made to union pursuant to a settlement agreement, finding that such payments are permitted under 29 U.S.C. § 186(c)(2)); *Trull v. Dayco Prods.*, No. 1:02-cv-243, slip op. at 17 (W.D.N.C. April 9, 2007) (approving a retiree healthcare class action VEBA settlement and holding that "[a]ll payments to be made by [the company] to the VEBA in accordance with the Settlement Agreement are authorized by § 302(c)(2)").  *See also United States v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008) (finding that settlement payments can be made pursuant to § 302(c)(2) where there is "some level of structure or formality in resolving a dispute to evidence the legitimacy of the ensuing payment").

      35.    Goodyear's payments under the settlement to the USW and its agents and advisors are made to resolve a disputed claim.  These payments include Goodyear's contribution

36

to the VEBA, its reimbursement of USW fees and expenses for counsel and other professionals in pursuing this litigation and negotiating the settlement, its payments to Committee members during the start up and transition period, and its payments to attorneys and consultants assisting the Committee in investigating and securing benefit plan administrators.  All such payments are approved pursuant to Section 302(c)(2) of the LMRA, 29 U.S.C. § 186(c)(2).  The payments will not affect the amount of money that Goodyear has agreed to contribute to the VEBA.

        F.        <u>Notice.</u>

        36.      Notice of the settlement was provided to the United States Attorney General and state attorneys general pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715(b).

        37.      Notice of the settlement was also provided to Class Members pursuant to this Court' Order.  (Doc. 33)  This notice was the best practicable under the circumstances.  *See UAW v. General Motors*, 497 F.3d at 630 (approving settlements in which individual Class Members received notice packets).

        G.        <u>Retention Of Jurisdiction.</u>

        38.      Pursuant to the Settlement Agreement, the Court retains exclusive jurisdiction to resolve any disputes relating to, arising out of or in connection with the enforcement, interpretation or implementation of the Settlement Agreement.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 382 (1994) (stating that a district court retains jurisdiction to enforce a settlement agreement if it either (1) has language in the dismissal order indicating its retention of jurisdiction or (2) incorporates the terms of the settlement agreement into the dismissal order); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 645 (6th Cir. 2001) (same).

H.      Conclusion.

39.      For the foregoing reasons, the Court finds that the objections to the settlement are not well founded, and APPROVES the parties' Settlement Agreement in its entirety.  The Settlement Agreement is binding upon Goodyear, the USW, and all Class Members, and the plaintiffs release all claims that were asserted and/or could have been asserted in this lawsuit. The plaintiffs' claims, including the claims of the Class, are hereby DISMISSED with prejudice pursuant to Fed. R. Civ. P. 41(a)(2) and 23(e).


        IT IS SO ORDERED.


 August 22, 2008                              /s/ John R. Adams
Date                                        John R. Adams
                                            U.S. District Judge

38